4-18-0788 Ethan Barnett v. The Workers' Compensation Commission Counsel, you may proceed. Thank you. May it please the court, my name is Mark Wilson. I represent the petitioner in this case, Ethan Barnett. In this case, the arbitrator initially found Mr. Barnett to be permanently and totally disabled. The commission subsequently modified the award to 50% man as a whole. It's our position that the modification of that award is against the manifest will of the evidence. Now, to summarize the facts, the petitioner had a work accident on November 17, 2010, while working as a sandblaster for the responding. The accident itself was a lifting accident, and it caused injury to his back. Now, at the time of the accident, the petitioner was 21 years old. His past work had only consisted of heavy manual labor. He also only had a GED when he dropped out of high school after two years. Now, following the work accident, the petitioner ultimately underwent a back surgery that was performed by Dr. Geisler on February 11, 2013. Now, the surgery performed, it was a L4-5 and L5-S1 anterior discectomy and fusion. Now, you may not want to spend all your time on the medical evidence. I mean, we know that the arbitrator awarded permanent and total disability benefits, right? And then the commission came along and they substituted the percentage of the person as a whole. I mean, that's really what ended up happening. There was conflicting medical evidence, right? I mean, you had medical evidence on behalf of the claimant. The employer had medical evidence on the other side. And then the commission resolved the pamphlet and the evidence against the claimant, and they gave you the permanent total. Why couldn't they do that? Well, it's my position, Your Honor, that first of all, the commission, they misstated the law. They indicated that in this decision, they suggested that an individual must prove permanent total disability, either by a medical determination that the petitioner is permanently and totally disabled from employment, or by a diligent but unsuccessful job search. In fact, that's not the law. An individual may also prove permanent total disability by showing that by age, training, education, experience, and conditions, no jobs are available to an individual in like circumstances. But they resolved the medical evidence. They didn't think that the medical evidence established that. But, Your Honor, to another point that I think deserves consideration, there is a second way of establishing the ADLAT, the dual requirements, that because of his age, training, experience, and condition, there are no jobs available for a person in circumstances. Here's the question. Did the commission ever rule on that second alternative way? Did they make any findings or rulings specifically on the alternative method of establishing the ADLAT compensation? No, I don't believe that they did. But there was evidence that he could work certain specified jobs, wasn't there? It was based upon outdated—that was by Mr. Hamden. The basis of his opinion was on medical evidence that was outdated by three years. And, Your Honor, the facts that were used by the commission are so outrageous here that I believe that they should just be disregarded because they relied on facts from records of August of 2013. That was what Dr. Ranella indicated would be—he suggested as the— Are you arguing that there is—their finding that he is not medical total permanent is against the manifest way of the evidence? Are you arguing that or not? That's one of the aspects of it because I made two arguments. I thought from a medical standpoint that when you take into consideration the functional capacity evaluation that limited him to only being able to do four hours of work, that that in and of itself was, by definition, that's not competitive employment. But that's not medical permanent total. Okay, I'll go to my— Ranella is sufficient to support the commission's decision that he is not a medical permanent total. Now the question is, is there evidence in the record from which they could find that he's not an odd lot? That's the issue. You're sort of conflating the two. Yeah. Now you're down to the odd lot. Okay, so let's deal with the odd lot. My view on this, and I cited this actually in my reply to part of my brief, is that expert opinions must be supported by facts and are only as valid as the facts underlying them. And I cite the Inouye Joseph case. And the opinions of Dr. Ranella, the retained expert, and Bob Kamen should be deemed invalid and given no consideration whatsoever. And the reason is, is because Dr. Ranella indicated—he admitted in his deposition that he was relying on records from 2013 that were stale records, that just objectively there is just no way that those restrictions could have been deemed appropriate as at the time of this hearing three years later. It ignores all this objective evidence. It ignores the CT scan. It ignores just a ton of medical evidence. Who is Gustafson? Excuse me? Who is Gustafson? Dennis Gustafson was my retained vocational expert, and he relied upon the functional capacity evaluation that was done just prior to the hearing in 2016. And those are the appropriate restrictions that should have been considered in this. And we can't rely on a person's capabilities from three years before. Let's segment this out, because I want to be sure we're not complaining the same thing again. Under ADLAT, you've got two components. One, a diligent but unsuccessful job search, okay? Did he really make that—he didn't really testify that he did that, did he? No. Okay, so that's off the table, right? Okay. So now you're down to the evidence establishing that because of his age, training, and education experience, there's no suitable jobs available for a person in his circumstance. Yes. I'm a little perplexed because I don't see that the commission ever ruled on that component of the ADLAT analysis. So let me ask you a very poignant question. Okay. Just as often as I'll find you can make an argument, there's some evidence on the record. To make a decision, we're down to should this case be remanded, because we don't know exactly what the commission thought on that component of the test, because they didn't say anything about it. Clearly it ruled there wasn't medical evidence, there's no diligent job search, but they didn't really opine on the second component of the test. So should we remand it or not? I mean, I would agree with you that that has not been done. That was not an analysis that was conducted. What do you make of that? Well, I believe that it was that they seemed to just skip over that. What's the evidence? They don't have to address it if there's nothing in the evidence. What is the evidence that would suggest that there was age, training, education, experience, and conditions with no available jobs? Mr. Gustafson? Yeah, Mr. Gustafson. That's where you should focus your argument. Okay, I will do that. Mr. Gustafson met with the petitioner. He indicated that at the time of this accident, he had only had two years of high school education and GED, very limited work experience. He had begun working at the birth center in January of 2009. He gained no skills as a result of the jobs performed by him as far as past employment. And this was, by the way, that was agreed upon by Hammond, who's the respondent's expert. He testified that the functional capacity evaluation results clearly point to work in an office-type environment that would allow him to change positions regularly, but he doesn't have any skills to develop in clerical activity. Now, at the time of the vocational assessment, Barnett declined. He was taking two types of morphine sulfate. Gustafson testified that employers would not hire an individual who they knew were taking narcotic medications such as morphine. Mr. Gustafson further testified that it's not realistic to expect Barnett to be able to obtain a clerical job consistent with the FCDE results. All right, so it's fair to say that Gustafson came to the conclusion that he met the second, excuse me, component of OBLAT, that because of his circumstances, experience, there are really no jobs available for him under the circumstances, correct? Yes. Okay. And the commission never really ruled on that aspect, correct? Yes. Correct, Your Honor. Didn't Gustafson indicate that he would have to seek further education, training for skilled employment potentially consistent with his physical limitations? He suggested that as an option, but at the same time he said it would be a struggle, I think, for him to even get to college or whatever. Well, he advised the claimant to seek assistance from a vocational guidance department at a community college, didn't he? I think he did recommend that as an option, but then later on kind of backtracked for a little bit. But I believe he did indicate that. Something else that I thought was very important with regard to Hammond's testimony, Bob Hammond, who's the respondent's vocational expert, he identified, most of the jobs he identified were manual labor jobs, and Dr. Ranella, their I.N.E. doctor, indicated that he should avoid manual work, and I did take Dr. The switchboard manual work? No, that was one of the ones that wasn't. Telephone jobs, manual work? Well, it eliminated virtually all the non-customer service telemarketing jobs. What's a sterile processor? Excuse me? What's a sterile processor? I've got to tell you one more. One of the things that I think is an important fact is that the commission, they did not even acknowledge the fact that Dr. Ranella said that the petitioner should avoid manual labor, but then they said that Dr. Ranella did not explain what manual labor was, but he did in his deposition, and it did eliminate a lot of the jobs that were identified by Mr. Hammond. Now, this narcotic medication, is that going to be permanent? I mean, is there any indication that he will get off it at some point? There's no indication of it at all. I mean, everybody has justified it. I mean, nobody's saying he's abusing it or anything like that, so there's been no suggestion of him. Just for pain tolerance? Is that part of why it's taken? Yes, Your Honor. Was there something in the record, too, he had to stand up every 20 minutes or half an hour or something? Yes, and that was one of the reasons why Mr. Gustafson said that he wouldn't even be able to do the sedentary work because of not being able to sit long enough to do that. And another point that I felt was very important is that I asked Dr. Ranella, their doctor in cross-examination, did you ever see any symptom magnification at all in the records? He said no, he didn't at all. He said that he didn't believe his pain complaints were genuine or fraud. So if there's any other questions, I'll come back and talk to you. You still have time. Oh, I'm sorry about that. No, no, the red one. Oh, okay, okay. You can still scoot through the intersection. Only when it has red can you not enter. Okay, okay. So it's – Gustafson also indicated that the client's personality or lack thereof would prevent him from doing clerical jobs or customer service jobs because he was such a pain in the butt, I think is what he called him. Yes, and I'm not – I've not seen that before where they come right out and say this guy just doesn't have the personality to do any of these types of jobs. Yeah, I hate to bring this to your attention, but he also dropped an F-bomb during the arbitration. I don't know if you – No. Yeah, but he literally did in the trial. Didn't help the cause, huh? It did help because the arbitrary rules were in favor of it. That's right. So I should tell you something. But anyway, yeah, that is true. That is true. So it was my position coming into this that I just thought it was outrageous that the commission relied upon Hammond's opinions over that of Gustafson because Hammond's opinions were based upon work condition records from three years before when there was just a mountain of evidence after that that was talking about his difficulties with things that matched up with how the functional capacity evaluation ended up being. And that was a valid functional capacity evaluation. Another thing I wanted to point out is that the – Dr. Patel, he's the one that recommended functional capacity evaluation, and he indicated that there were permanent restrictions in place in that MMI after those restrictions. And yet that was ignored by the commission in the decision. And also in Bob Hammond's testimony, he kept saying that, well, no doctor went and recommended those restrictions. And they did. He's like, no doctor indicated those were the permanent restrictions, and he's ignoring Dr. Patel's testimony that those were permanent restrictions. Thank you. Okay. We have time for a reply. Thank you, Counsel. Counsel, you may respond. My name is Mark Kozmian. I'm the employer. I support Wilson. To start off with a couple of questions you had. Sterile processor. I think Bob Hammond described that as someone who would sterilize a medical equipment after it was used before it went back into service. You correctly laid out that this is a math this way question. It really comes down to, in my mind, Gustafson versus Hammond. Can you go back and forth? It's our stable data, Mark. What do you make of the commission's total failure to address the second component of the odd lot theory? They never specifically held, never addressed that in their decision. I agree that it's never spelled out, but by saying that they found the testimony of Bob Hammond to be persuasive, I think that does address it. Because Bob Hammond testified that there's a stable labor market for this fissure, this fissure, in light of all of this age and education, in light of these physical restrictions, that there's a stable labor market. And when they find that testimony to be persuasive, I think that does address the issue. Should we be required to fill in the gaps? I mean, how difficult would it have been for them to address that? I would have loved to have written the decision myself and have it spelled out. But because they didn't spell it out, I don't think that's a fatal flaw in finding that their decision is not against the math this way that the others did. Why shouldn't it be remanded for them to do their job? I'm not willing to concede that. I think they did do their job. I would have loved for them to spell it out more clearly. But by saying that they're adopting the opinions of a vocational consultant who says there's a stable labor market, I think that goes far enough. But we've got to make not an assumption. That's not the right word. But we have to accept that that's what, in fact, the ruling did, that it did, in fact, consider the testimony of Hammond and that they were persuaded by that testimony. Well, I mean, they described it in their several-page decision. They described the testimony that was put in the record, which includes Hammond finding there's a stable labor market. I don't think it's a big stretch. I don't think it's a stretch to say that's a reasonable inference. It has to be inquisition. It has to be inquisition because it's not in the record. They discounted a portion of Gustafson's opinion because he relied on this notion that the petitioner was unsuited for office work because he had an unpleasant demeanor. And the commission said, absent an identifiable psychological condition, that's an inappropriate criteria to determine employability because somebody has a disagreeable demeanor. That's exactly what they said. And I think there's more to it than just that, but that was a notable reason when the petitioner is relying on the testimony of their vocational consultant, basically says the guy's too irritating to go back to work. Okay. I assume he's without reason. There was a lot of discussion in the council about the restrictions that were imposed. And leaving out the part that Dr. Ranella and Bob Hammond both considered the functional capacity evaluation, Dr. Ranella said his opinions concerning the lifting and pushing and pulling restrictions didn't change. They were essentially, the FCE showed the same thing that he observed from the work hardening treatment a few years earlier. Then he got all those other extraneous ones, you know, sitting and standing limitations, and Dr. Ranella refused to adopt those because, one, they're subjective, and two, they're not really tested. And, you know, to take that a step further, you know, you look at Fisher's own testimony. He says you can only sit for anywhere from 5 to 20 minutes without having increased pain. Well, he drove for, he sat for an hour, he wasn't sure, from home to the trial, and they only stopped once. All right, so that gets him up to at least a half an hour, twice. He sat in uncomfortable chairs waiting for his trial. He sits for a 50-minute direct exam, and he rates his pain as a 7 out of 8, or 7 to 8 out of 10. But then on a cross-exam, it was down to a 5. So maybe sitting isn't such a problem. Maybe he's exaggerating a little bit. I think that's a reasonable inference. He testified that he can't sit, but he does take hour-long baths, which, okay, that's inconsistent. And to take that another step further, he told Dr. Ronella, I'm sorry, Dr. Eilers, that he only takes showers because he can't take baths, he can't get in the bathtub. Well, his subjective complaints and his subjective description of his own problems are inconsistent within themselves. So to say that the functional capacity evaluation, addressing those subjective complaints, should be relied upon, I think is inappropriate. But doesn't that go more to the medical, the weight of the medical evidence, as opposed to whether or not there's some kind of a market, stable labor market for a person in the circumstances? Well, I don't know about more, but I think it's involved with the labor market. You're not denying he's on this medication and he has a lot of physical problems, are you? Well, I'm not denying that he takes medication. He certainly had surgery. Of course, the commission found Dr. Ronella's testimony most persuasive. He's the only one who said, don't do surgery, it's not going to work. So to now say that he's got all these issues, it almost seems disingenuous to go that route. He shouldn't have surgery with him, and Dr. Ronella said that. But he did. We can't punish him now for having surgery, can we? Well, I'd like to. That's an open and candid answer, I suppose. The question is, did the commission find that he was not a permanent total under an odd-lock theory? Now, Hammond said that he was currently employable in a secondary to light workload. He agreed with Gustafson's recommendation for education and found that if you can attend school full-time, you can work full-time. Hammond identified the jobs he identified would have allowed him to change position and occasionally sit in the standing. He did not believe that the plaintiff's lack of experience precludes him from an entry-level clerical position. They'll train employees. Many of the jobs require more of the high school education. That entry position is a good example. Then the commission says, ultimately, on page 8 of their opinion, the commission finds the testimony of Dr. Ranella and Mr. Hammond more persuasive than that of Dr. Eilers and Mr. Gustafson. Well, if they have found the testimony of Hammond more persuasive, and Hammond says he can work and there are jobs out there that he can do, then how do we say that they didn't decide the odd-lot issue? Well, that's what I was saying before. By adopting Mr. Hammond's opinions, saying that his testimony was persuasive, I think they did address that issue. We have to make assumptions, though, don't we, come to that conclusion? I won't use that term, assumptions. Or fill in the gaps? I think what's there allows for a reasonable inference, which is certainly permitted. Any further questions? I've got pages and pages of notes here. We have time, so I'll ask this question. So if we accept the employer's argument that there is a reasonable inference that the commission addressed the second prong of odd-lot, just briefly support that with the evidence that we can glean from the record? Well, we start with the restrictions. He's got restrictions of basically light and maybe some medium-level work. You've got Bob Hammond who says there is work for this person with this education, with this training, with this experience, and these physical limitations. There's a stable labor market for that person. Well, that doesn't wait with the odd-lot permanent vote. That's all the evidence there is. Well, the commission made a finding. It's an interesting finding. Petitioner testified that he never looked for any employment after his accident. That's true. That eliminates one of the tests. Then it goes on to say, and that he has not attended school or participated in any other vocational training, which Hammond said, or Gustafson said, he can go to community college and get retrained. Therefore, petitioner does not qualify to be declared permanently and totally disabled from gainful employment under an odd-lot theory. Now, does the finding after the conjunction and, that he has not attended school or participated in any other vocational training, eliminate a finding of odd-lot based on education, age, transferable skills? I don't think so. I think what that does do is eliminate maintenance benefits, which is not an issue. So then, how did they come to the conclusion that he is not totally disabled from gainful employment under the second half of odd-lot? By relying on the testimony of Hammond. Of Hammond. Okay. He was actually throwing you a softball there for a second. Thanks. With that, I'm going to ask that the Commission consider the affirmative. Thank you, Counsel. Counsel, you may reply. Well, in response to that, I believe it would be objectively unreasonable for the Commission to find Hammond's testimony to be more favorable than that of Gustafson, when Hammond was relying on admittedly stale medical records. And Dr. Ranella, during his deposition, even acknowledged that. He acknowledged that he hadn't seen the physician in three years, that he did not view any medical records after August of 2015. And to say that one of the arguments that were made was that Hammond said, oh, well, they're essentially the same anyway. Well, they're not, because Hammond did not take into consideration any of the non-material handling capabilities having to do with occasional sitting, standing, and walking, and waist-high reaching. He did not consider any of that. And to avoid bending the slide. That's not true, according to the Commission. The jobs Mr. Hammond identified would have allowed change of position in occasional sitting and standing. Occasional sitting. Slash standing. And in addition, Mr. Hammond did not believe the petitioner's lack of experience precludes him from an entry-level clerical position. Well, in taking into consideration all of those things, and that there's also a four-hour half-day time limit put onto by the test taker of the FCE, as well as Dr. Patel. So, I mean, that in and of itself is indicating he wouldn't be able to perform competitive full-time employment. I just wanted to bring to your attention that, just to show how unreasonable those restrictions were from back in 2013. It was August 2nd of 2013 is where, out of the work conditioning records, where Dr. Grinella pulled up those capabilities that he used for his permanent restrictions. And in that note, for that time period from June 26th to August 2nd, 2013, it was indicated in the record, the period of work conditioning program, that he participated in 24 sessions with two cancellations due to difficulty getting out of bed because of pain. On August 2nd, he was discharged from the work conditioning program due to limited progress. He then followed up with Dr. Geisler on August 14th, and Dr. Geisler noted the back pain was the same or worse than it was before the surgery was performed, and he indicated that the physical therapy aggregated his pain. He then had him undergo light physical therapy, which showed that he was limited in all these things with the sitting, the standing, the walking, all those non-material factors. So, I do believe when you take all that into consideration, it would be just objectively unreasonable to take any opinions over that of Dr. or then discuss this, and especially when you consider that he did not take into consideration the manual labor part of it that should be taken out, as well as the fact that Dr. Patel put permanent restrictions on. And that was something that Dr. Holman did not seem to know about. So, for these reasons, I believe that the modification of the decision to a 50% person as a whole finding is going to be necessary. Thank you, counsel. Thank you, counsel, both. Your arguments in this matter will be taken under advisement, and a written disposition shall issue.